**STATE v. AQUILERA, et al.**
No. 711-101S, and 81 others.
County Court, Dade County.
May 7, 1979.

Janet Reno, State Attorney, and Kenneth S. Drucker, Assistant State Attorney, for the state.

Bennett H. Brummer, Public Defender, and Michael Lederberg and Paul Tunis, Assistant Public Defenders, for the defendants.

ALFRED NESBITT, County Court Judge.

This cause came on to be heard on the defendants' motion to suppress and/or exclude the results of radar speed measuring devices, with both the defendants and the state presenting expert testimony and introducing exhibits to support their respective positions.

At the outset, Messrs. Michael Lederberg and Paul Tunis for the Public Defender's office and Mr. Ken Drucker for the State Attorney's office are to be commended for affording the court an opportunity to be truly informed of the issues in this complex case of first impression, without the necessity of hurdling technical

obstacles since all parties have agreed to waive most legal niceties in the search for reasonable answers to the questions involved.

Although there have been a few challenges to radar readings in other courts, I say case of first impression because, as far as has been determined, this is the first time that any court has been presented so much testimony and so many exhibits from so many qualified experts summoned from all parts of the country. This is undoubtedly due to the fact that no single defendant can afford the tremendous cost in money and time to produce such a defense to a speeding charge.

The court has heard over two thousand pages of testimony and arguments, and has also examined thirty-three exhibits presented by highly trained and experienced specialists in the fields of mathematics, electrical engineering, and the design, construction and testing of radar devices. Of course, the various and many times diverse opinions of these renowned experts must be tempered by their respective interests in the results of this hearing.

At this point, let us understand that this hearing has dealt only with radar used by police as speed measuring devices in its present mode. There has been no argument with the Doppler system itself, but only as to its use by the current units. Although not having any real bearing on the questions before the court except, perhaps, to emphasize the arguments herein, there has been an apparent belief throughout this hearing that these devices can and should be improved to the extent that they are accurate and identification of the target vehicles can be readily made, under any conditions.

Undoubtedly, the manufacturers with their scientific and financial resources can accomplish this in the very near future. The prime inhibition against such success is their quoted awareness that the purchasing agents at all levels of the government seem to place economy ahead of quality. If this is true, then it is a disservice to the motoring public, and can place the courts in an untenable position. As the court said in Wisconson v. Hanson, Case #76-061, 1978, "For the average law abiding American citizen, minor traffic offenses constitute the only contact such a person will have with the law enforcement and judicial system. Public confidence rests upon the fairness of such proceedings . . . fairness dictates that contested prosecutions are conducted according to meaningful standards, which insure the instrument's accuracy." Although the court there referred to certain guidelines, I feel it is equally applicable to the use of inadequate specifications for the evidentiary speed measuring unit.

With respect to the desire for economy, we should refer to the testimony of Mr. Sargent, a manufacturer's official, who disclosed

that in large quantity purchases, they were able to reduce the single purchase price of $2,500 per unit to $375 per unit. Without questioning what may seem to be a strange profit structure, it would behoove us to establish a central purchasing office on the state level for radar units so that advantage can be taken of such substantial reductions. The total number of units required could be determined by the requisition from the various lower governmental entities which would then pay for their share at the discount price. Thus the savings would, at least in part, offset the increased cost of the improved product. In line with this procedure, I would then urge such agency to retain the services of independent, highly skilled radar engineers to establish sufficiently high standards of specifications so that accuracy of speed readings and exact identification of the target vehicle will be assured under any conditions.

I recognize that many millions in revenue are involved in "speeding" fines but let it be understood once and for all, the function of the traffic court is to convict the guilty, acquit the innocent, and improve traffic safety, not to be merely an arm of any revenue collection office. At the same time, if the errors alleged by the opponents of radar do exist, then one must wonder — What percentage of these millions of dollars has been collected from erroneously convicted defendants? — How many of these defendants have suffered the additional penalties of extremely higher insurance rates, and the unnecessary compiling of points with the consequent loss of drivers' licenses and perhaps jobs?

While not pertaining to the reliability of radar, it is incumbent upon the court to refer to the part of the testimony which raises the spectre of radiation within the police vehicles. It is conceded that the amounts involved are within government safety limits, however, we must take notice that such limits have been wrong in other areas and unfortunately the effects are sometimes not observed until the next generation. My concern is further enhanced by the statement of the expert witness, Dr. Nichols, that there is an ongoing invesigation of the problem.

Without repeating any of the voluminous testimony, suffice it to say that it contained in-depth studies of practically all of the errors alleged to be inherent in varying degree in the vast majority of radar units in present usage. Described therein were the Cosine error; Batching error; Panning and Scanning errors; Shadowing error; errors due to outside interferences such as billboards, overpasses, passing C. B. radios and many other similar causes; errors due to inside interferences such as heater and airconditioning fans, and police radios etc.; errors due to improper mounting of the radar unit; errors due to heat build up; errors due to power surge by shutting off and turning on the radar at the last minute to avoid

radar detecting devices; errors due to the auto lock system; errors due to reliance on the auto alarm system; errors due to mirror switch aiming; and errors in the identification of target vehicles due to modern day traffic patterns and the mixture of sizes of vehicles and varied materials in their construction.

Admittedly more of these errors pertain to radar in the moving mode than in the stationary mode. Certainly, some of these problems are minimal in degree but their potential has been attested to not only in scientific theory but many have been perceived in actual tests by the witnesses. The state's witnesses have denied these problems but in doing so have expressed a reliance on adequately trained officers recognizing same and not issuing tickets. However, the defense witness, Dr. Nichols, whose expertise and objectivity have been conceded by Mr. Drucker, has prescribed an intensive course of training in both classroom and in the field with written examinations for proofs of qualification, conducted by an independent, highly skilled radar operator and not by a manufacturer's agent or his students. Such a program has not apparently been pursued. Even with this type of curriculum, Dr. Nichols seems to imply that there would only be a lessening of the problems.

All of this resolves itself into one main issue, to wit — the reliability of radar speed measuring devices as used today.

Based upon all of the testimony, exhibits, and argument of counsel, I find that the reliability of the radar speed measuring devices as used in their present modes and particularly in these cases, has not been established beyond and to the exclusion of every reasonable doubt, nor has it met the test of reasonable scientific certainty, and it is therefore ordered and adjudged that the motions to suppress and / or exclude herein be and they are hereby granted.